## MacLEOD et al. v. GRAVEN.

(Circuit Court of Appeals, Sixth Circuit. April 14, 1896.)

### No. 354.

CONTRIBUTORY NEGLIGENCE—CROSSING RAILROAD TRACKS.

One G. was a passenger on an electric railway operated by defendant. At the station where he was to leave the train, there were platforms, on both sides of the double track, on a level with the car steps. The ground between the tracks was considerably below such steps, and was ungraded and unpaved. On reaching the station, G., who lived near by, in order to save walking about 15 or 20 feet, left the train by the side opposite the platform intended for the discharge of passengers from his train, and attempted to cross the other track, in doing which he was struck by a train approaching on such track, and so injured that he died. Before he stepped off the train, he turned up his coat collar, and pulled down his hat, to shield himself from rain which was falling. It was daylight at the time, and, on descending from the train, G. was in a place of safety, from which he could have looked for a train approaching on the other track; and the time elapsing between his leaving his train and the accident indicated that the train by which he was struck must have been only a few yards away, and in plain sight had G. looked when he descended from his train. G. was familiar with the road, and knew that trains were passing frequently in both directions. *Held*, that G. was guilty of contributory negligence, which barred him from any right of recovery, even if defendant had also been negligent; and that the jury, in an action by G.'s administrator against defendant, should have been so instructed.

In Error to the Circuit Court of the United States for the District of Kentucky.

Bennett H. Young and Young, Trabue & Young, for plaintiffs in error.

Gardner & Moxley, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and HAMMOND, J.

LURTON, Circuit Judge. The intestate of the defendant in error, while crossing one of the tracks of an electric street railway, was struck by a moving car, and received such bodily injuries as resulted in his death. His widow and administratrix has recovered a judgment for the damages thus sustained, against the plaintiffs in error, who were operating and managing the street-railway line as receivers. To review this judgment, this writ of error has been sued out. The defenses interposed by the plaintiffs in error were: First, that they were not guilty of any negligence; and, second, that the deceased himself so far contributed to his misfortune, through his own negligence, that, but for the absence of ordinary care and caution on his part, the collision by which he suffered would never have occurred. At the conclusion of the whole of the evidence, the plain-

tiffs in error moved the court to instruct the jury to find for the defendant. This was refused, and this action of the court is now assigned as error.

The plaintiffs in error were receivers in possession and operation of a line of electric railway under order and direction of the circuit court of the United States for the district of Kentucky. This line consisted of two parallel tracks, extending from a point in the city of Louisville, Ky., to a point in the city of New Albany, Ind. Cars going west used the most northerly of these tracks, and those going east used the other. Alpha Graven, the deceased, lived in the western part of the city of Louisville, near the Twenty-Sixth street station of the company, and was accustomed to go into the city on the cars of the railway company, taking them at the Twenty-Sixth street station, and returning every evening by the same route. On the afternoon of May 10, 1894, he returned from the city in the usual way, taking a car at Seventh street. The train consisted of a motor car, with a trailer attached. When nearing the Twenty-Sixth street station, he came out of the motor car, and stood under the hood of the rear platform, until the train slowed up for Twenty-Sixth street, when, without waiting for the car to stop, he jumped off upon the right-hand or southerly side of the car, and started across the parallel track somewhat obliquely, in the direction of the Twenty-Sixth street crossing, and, just as he stepped upon the second track, was struck by the forward corner of a motor car going east. The collision was so violent as to knock him down in such position that he was dragged along for from 20 to 40 feet by the oil box attached to the car. Deceased left the car before Twenty-Sixth street was reached, and undertook to cross the parallel track at a place which was not a public crossing. The two tracks were from 7 to 9 feet apart. The space between was neither graded nor paved, and was part of the private right of way. It was some inches lower than the level of the tracks. There was a platform on the right or northern side of the track, for the convenience of passengers getting on or off the cars going west, and another upon the opposite side of the parallel track for the use of passengers taking or leaving cars going east. These platforms were about level with the lower step of the cars, were each about 118 feet long, and extended up to the line of Twenty-Sixth street. Deceased lived on the south side of the railway, and, to reach his home, was therefore obliged to cross the railway. He had two courses open to him when his car reached Twenty-Sixth street,—either to get off on the platform provided for that purpose, thence, by the platform, to Twenty-Sixth street, crossing the railway at the crossing of that street; or he could get off on the railway right of way, crossing the track at point of debarkation, and thence obliquely to Twenty-Sixth street. The distance saved was possibly from 15 to 20 feet. There was no other advantage in debarking in the way deceased did, and that advantage involved a step down to the right of way of about two feet, and the danger of crossing the parallel track at a place other than a public crossing. The rules of the company required passengers to take and leave the cars by the platform. This rule was fre-

quently violated by persons living, as the deceased did, south of the railway, and there were no gates to prevent passengers from getting on or off the cars upon either side. The servants of the company operating the trains did not willingly acquiesce in violations of the company's rule, for they all testified that they endeavored to prevent it when done under their observation. There was in evidence a rule of the company requiring that "all trains and engines on either track must approach Twelfth, Eighteenth, Twenty-Sixth, and Twenty-Ninth streets under full control, and keep careful lookout for passengers crossing to and from K. & I. trains, and must NOT UNDER ANY CIRCUMSTANCES PASS THESE STATIONS while K. & I. trains are RECEIVING OR DISCHARGING PASSENGERS." The evidence tended to show that this east-bound train passed the Twenty-Sixth street crossing at full speed, and was not under control, as required by this rule. There was a conflict of evidence as to whether the motorman on the train had made any effort to prevent passing the station while the west-bound train was receiving or discharging passengers, though the motorman testified that he threw off the current before crossing Twenty-Sixth street, because he saw the other train pulling into the station. There was a conflict of evidence as to whether the gong was sounded or any other warning given upon approaching or while crossing Twenty-Sixth street. The evidence also tended to show that the train which collided with the deceased was traveling at a speed of from 15 to 20 miles per hour when it crossed Twenty-Sixth street, and when it struck deceased.

Assuming, therefore, that the evidence relating to the negligence of the railway company was such as to make an issue for the jury upon that part of the case, we come to the important question upon which our judgment must turn: Was the evidence touching the alleged contributory negligence of the deceased undisputed, and were the facts touching his negligence such that all reasonable men must draw the same conclusion from them? If so, the question of contributory negligence was one of law for the court. If not, the whole case was properly submitted to the jury.

Upon this branch of the case, counsel for defendant in error have assumed that the resemblance between the facts of this case and those stated in the opinion of the supreme court in Railway Co. v. Lowell, 151 U. S. 209, 14 Sup. Ct. 281, is so strong that the judgment here should be governed by that case. While there is much in common between the cases, there is much that distinguishes them. That case did not turn upon the question as to whether the plaintiff had looked or listened before undertaking to cross the track, for it is distinctly stated in the opinion that he neither saw nor heard any train coming. More important still is the fact that the request for a peremptory instruction was made after the conclusion of the plaintiff's evidence, and was not renewed at the conclusion of the entire evidence. That motion could not be the subject of an exception or error, as it had been waived by the introduction of evidence after it had been overruled. Railroad Co. v. Hawthorne, 144 U. S. 202–206, 12 Sup. Ct. 591; Bogk v. Gassert, 149 U. S. 17–23, 13 Sup. Ct. 738; Railway Co. v. Callaghan, 161 U. S. 91, 16 Sup. Ct. 493.

The only errors cognizable upon the writ of error were those pertaining to the instruction touching the plaintiff's alleged violation of the company's regulation requiring passengers to alight from the train on the platform side. This question, upon the facts of that case, was held to have been properly submitted to the jury, under proper instructions. In that case it appeared that there were two tracks, with a platform, on either side of the double track, as here. The plaintiff's residence was on the side of the track opposite to the platform provided for passengers debarking from his train. He could have gone under these tracks, or crossed at grade. He chose the latter, and was run down by a wild train running backward, without a light, and which gave no warning. Concerning the question as to whether the action should have been defeated because the plaintiff had not disembarked on the platform, and gone under the tracks, the court said:

"We are of opinion that there was no absolute obligation on the part of the plaintiff to cross the track by way of the ravine known as 'Victoria Street.' To do this would have required him to descend a flight of steps at the east end of the station, about fifteen feet to the level of the street, which was not graded or in any way improved, but was a natural ravine, passing under the tracks at this point. There was a stream of water, varying in width from two to six feet, and in depth from two or three inches to two feet, running over the surface of the street under such tracks. The ground beneath the tracks was marshy, muddy, and wet at the time. The street was uneven and irregular, and there were no lights or other illumination along the street at that point, and the night was dark. It seems to have been the universal custom for all persons living on the south side of the tracks to cross over the tracks in going to their homes, and not under the tracks by Victoria street. Under such circumstances, the plaintiff had a right to make use of the customary mode of alighting and reaching his home." Railway Co. v. Lowell, 151 U. S. 218, 14 Sup. Ct. 281.

Even in this particular there is a most striking difference between that case and the one at bar. To have gotten off on the platform, and crossed the railway at the street crossing, was no greater inconvenience than to add about fifteen feet to his necessary travel towards his home. To offset this, he had a step of about two feet down to the right of way, which was unpaved, and was obliged to cross the ties and rails of a track ballasted only with cinders. Neither did the proof show, or attempt to show, that the method adopted by deceased was the "universal custom for all persons living on the south side of the tracks in going to their homes," as was shown in the Lowell Case. The most that was shown was that some persons living in that neighborhood did adopt that plan, but it was neither general nor acquiesced in by the railway people. Though no good or even plausible reason appears for the failure of the deceased to debark upon the platform, and conform to the regulation of the company, still we are not prepared to hold that his failure to obey that regulation, and his undertaking to cross the track at the place and time he did, was, as matter of law, such contributory negligence as should have defeated this action. For the purposes of this case, and upon the facts of this case, placing upon those facts the construction most favorable to the deceased, we shall assume that the question of negligence in leaving the car as he did, and

crossing the track at the time and place he did, was a question for the jury, under proper instructions.

Passing by all other questions, we shall rest our judgment upon the conduct of deceased after he debarked from the car, and upon our conception of ordinary care and caution in crossing a railway track by one situated as the deceased was. Under the schedule of the company, a train was due to pass one way or the other every 7½ minutes. So, by the same schedule, the trains which passed at Twenty-Sixth street were due to pass each other between Eighteenth and Twenty-Sixth streets. There was, however, some irregularity in the passing point, for there was evidence that they sometimes passed at Thirty-First street. The east-bound train was on time the day of this occurrence; and, as the trains had not passed between Eighteenth and Twenty-Sixth streets, it was due to pass when deceased undertook to cross at any moment. His position before getting off the train was on the rear end of the motor car. That position necessarily cut him off from any view of the western end of the parallel track; so that, when he got off the car, he was for the first time in a position to observe a train coming from the west. But, before getting off, he had, as shown by all the evidence, obstructed both his ability to see and hear such a train by pulling his coat collar up about his ears, and his hat down over his face. The heavy rainfall added to his difficulty of seeing as well as of being seen. When he got down on the right of way, he was in no danger. He might have walked between the double tracks to Twenty-Sixth street, which was but 30 to 50 feet west, and in the direction of his residence, and then crossed by a macadamized street crossing. Thus, while in a place of safety, he might have looked up and down the track he was about to cross. It was broad daylight, being about 5:50 p. m. on a May day. The track was unobstructed, and there was no reason, if he had looked, for not seeing the train which struck him. When on the right of way between the tracks, he was in no danger. From this place he went into a place of danger, without taking the ordinary precautions required from all responsible persons who place themselves voluntarily in similar positions of danger. He made no stop to inspect the track he was about to cross, but heedlessly pursued his way, either not seeing because he would not look, or seeing and recklessly endeavoring to cross in front of the approaching train. If he was going at the rate of but 3 miles an hour, and the car at a speed of 15, the car would travel just five times the distance he walked, and demonstrates that, when he stepped off the car steps, the car which struck him was not more than 25 to 50 feet away. This calculation accords substantially with the evidence of the motorman and trailman on the east-bound train, who agree in saying that he got off almost in front of the passing east-bound train. Allowing for the distance each car would overlap the rails, it is altogether likely that he was brought in contact with this passing train before he had taken more than two or three steps. How is it possible that he could have exercised his sense of sight and hearing without both seeing and hearing this approaching train? What other inference could reasonable men draw than that

deceased was so inattentive to the danger to be apprehended in crossing a railroad track as that he neither looked nor listened, and thoughtlessly pursued his way, so absorbed by his effort to shield himself against the falling rain as to take no precautions against a possible collision with a passing train?

When one, by his own negligence, brings an injury upon himself, he cannot recover damages. The rule is well settled that a plaintiff cannot recover for an injury, although the defendant was guilty of negligence, if it appears that "the plaintiff himself so far contributed to the misfortune by his own negligence or want of ordinary care and caution that, but for such negligence or want of care and caution on his part, the misfortune would not have happened." Railroad Co. v. Jones, 95 U. S. 439–442.

The negligence of the servants of the plaintiffs in error in passing this Twenty-Sixth street crossing without having the train under control, or at too high a rate of speed, or in passing at all while the passengers from the west-bound train were debarking, or in failing to give warning by sounding a gong or whistle, may have been very culpable; still, it did not excuse the deceased from taking ordinary precautions for his safety.

In Railroad Co. v. Houston, 95 U. S. 697–702, it was said, concerning the duty of one undertaking to cross a railway track at a street crossing, that such a person—

"Is bound to look and listen before attempting to cross the railroad track, in order to avoid an approaching train, and not to walk carelessly into the place of possible danger. Had she used her senses, she could not have failed both to hear and to see the train which was coming. If she omitted to use them, and walked thoughtlessly upon the track, she was guilty of culpable negligence, and so far contributed to her injuries as to deprive her of any right to complain of others. If, using them, she saw the train coming, and yet undertook to cross the track, instead of waiting for the train to pass, and was injured, the consequences of her mistake and temerity cannot be cast upon the defendant. No railroad company can be held for a failure of experiments of that kind. If one chooses, in such a position, to take risks, he must bear the possible consequences of failure."

This language was approved in Schofield v. Railway Co., 114 U. S. 615, 5 Sup. Ct. 1125, which was a case where a peremptory instruction for the defendant, on the ground of contributory negligence of the plaintiff, was approved. If we assume that no train was due to pass the station at that time, that did not absolve the deceased from using his senses, and exercising reasonable precaution against the possibility that one might pass. Schofield v. Railway Co., supra.

Elliott v. Railway Co., 150 U. S. 245, 14 Sup. Ct. 85, was a case where a peremptory instruction for the defendant was sustained upon the ground of the contributory negligence of the plaintiff in going upon a railway track without looking and listening. In Elliott's Case the evidence established that the deceased had in broad daylight, with nothing to obstruct his view, gone upon a track with which he was familiar, with cars approaching not more than 25 or 30 feet away, and, before he got across the track, was overtaken by those cars, and killed. Concerning these facts, the court said:

"But one explanation of his conduct is possible, and that is that he went upon the track without looking to see whether any train was coming. Such

omission has been again and again, both as to travelers on the highway and employés on the road, affirmed to be negligence. The track itself, as it seems necessary to iterate and reiterate, is itself a warning. It is a place of danger. It can never be assumed that cars are not approaching on a track, or that there is no danger therefrom."

In the case of Blount's Adm'x v. Railway Co., 22 U. S. App. 129, 9 C. C. A. 526, and 61 Fed. 375, the cases we have cited were applied, and an instruction for the defendant was approved in a street-crossing case. In that case it was insisted that the fact that the gate maintained at the crossing by the railway company was not lowered operated to throw the deceased off his guard, and absolve him from the duty of looking and listening before he crossed the track. To this the court, speaking through Judge Taft, said:

"It is undoubtedly true that the failure to lower the gates modifies the otherwise imperative duty of travelers when they reach a railway crossing to look and listen, and the presence of such a fact in the case generally makes the question of contributory negligence one for the jury, when otherwise the court would be required to give a peremptory instruction for the defendant. The fact is much more important when the traveler is driving a horse and vehicle than where he is walking, because in the former case his attention is necessarily divided between the control of the horse and observation of the track, and his reliance upon the gates and flagman must, in the nature of things, be greater than in the case of a pedestrian. There is no reason why the latter should not look and listen as he approaches the railway track before he reaches the gates, and before it may be time to lower them. The right to rely on the action of the railway company's employé in lowering the gate is not absolute. State v. Boston & M. R. Co., 80 Me. 430, 444. 15 Atl. 36. If it were. then a man would be justified in walking up to and over a railway crossing with closed eyes and stopped ears whenever the gate is not down to obstruct his passage. The weight to be given to such an implied invitation depends on circumstances. In this case, Blount had stood at Hoy's porch, where he could see the track for 800 feet. From Hoy's gate. for sixty feet, he walked towards the track, while the train was in full view. and but three hundred feet away, and was getting nearer and nearer each second. As the train passed the ice house at a speed of fifteen miles an hour. its roar must have been heard by any one giving the slightest attention who was not one hundred feet away. When he was six feet from the track, the train was only thirty feet from him, and in full sight, and yet he did not halt or hesitate, but rashly stepped in front of it. It was a quiet night. There was no confusion at the crossing. There was no other train in sight. There was nothing to distract Blount's attention from the on-coming train except a self-absorption which, in approaching a railway crossing. is gross negligence. On these facts, can reasonable men fairly reach any other conclusion than that Blount was wanting in due care in not observing his danger?"

Where the facts touching a question of the negligence of the defendant, or of the contributory negligence of the plaintiff, are undisputed, and the inferences to be drawn from those facts are such as all reasonable men must draw, the question as to the effect of the facts is one of law for the court. Elliott v. Railway Co., 150 U. S. 245, 246, 14 Sup. Ct. 85; Gardner v. Railroad Co., 150 U. S. 349, 14 Sup. Ct. 140; Southern Pac. Co. v. Pool, 160 U. S. 438, 16 Sup. Ct. 338.

For error in refusing the request at the conclusion of the whole evidence to instruct the jury to find for the plaintiff in error, the case must be reversed, and a new trial awarded.